UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 JOSE L. SANCHEZ,

        Plaintiff,

    v.                                          6:04-CV-1098(HGM)

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HOWARD G. MUNSON
Senior United States District Judge

## DECISION and ORDER

Plaintiff commenced this action seeking judicial review of a decision by the Commissioner of Social Security denying Plaintiff's application for supplemental security income ("SSI").  The Plaintiff requests that this Court reverse the decision and remand to the Administrative Law Judge to further develop the record.  The Commissioner seeks to affirm the decision.  This Court has jurisdiction to review an unfavorable decision of the Commissioner under 42 U.S.C. § 405(g).  This Court finds that the ALJ's decision is based on improper legal standards, and grants Plaintiff's request to remand the case for further consideration.

**I.    FACTS**

Procedural History

Plaintiff alleges that he is disabled to psychiatric problems, arthritis, and back and hip pain.  (R. at 78).  On August 22, 2001, Plaintiff applied for SSI under Title II of

the Social Security Act, codified at 42 U.S.C. § 423.  (R. at 73-75).This application was

denied initially, and on February 7, 2002 Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ").  (R. at 28-32).  This hearing was held on September

17, 2003.  (R. at 388-426).  In a decision dated November 6, 2003, the ALJ found that

Plaintiff was not disabled.  (R. at 18-25).  On March 29, 2004, the Appeals Council

denied Plaintiff's request for review, and the ALJ's decision thus became the final

decision of the Commissioner.  (R. at 8-11).

On July 30, 2005, the Appeals Council denied Plaintiff's request for review.  (R.

at 7).  Plaintiff's commenced this action on September 21, 2004.  (Dkt. No. 1).  The

Commissioner answered on March 31, 2005.  (Dkt. No. 9).

<u>Non-Medical Evidence</u>

Plaintiff was age thirty-eight at the time of the hearing.  (R. at 73).  At the time of

his application, he lived alone, but at the time of the hearing he was in custody at the

Oneida Correctional Facility.  (R. at 388).  He completed ninth grade in special

education.  (R. at 122, 127, 135, 199, 237, 419-20).  He is functionally illiterate in

English and Spanish.  (R. at 76, 108).  His past relevant work includes stocking books

and magazines.  (R. at 76, 108).  He alleges that he lost his job due to an inappropriate

reaction to the work environment, including a quick temper, depression, blackouts, and

fights with coworkers.  (R. at 32, 126, 263).

At the hearing on September 17, 2003, Plaintiff testified that he was incarcerated

for approximately two years from 1999 to 2001.  (R. at 393).  He was incarcerated again

on a parole violation on March 28, 2003, for a one-year term.  (R. at 396).  During the

period from 2001 to 2003 when Plaintiff was out of prison, he treated for mental health

2

problems at Mental Health Connections in Rome, New York.  (R. at 398).  He also testified that he treated for his asthma and back, wrist, and hip pain with Dr. Bulawa in Rome, New York.  (R. at 399-400).

Plaintiff testified that he attempted suicide twice in March of 2003, which resulted in his parole violation.  (R. at 406, 412).  He stated that he had problems with depression and that he heard voices once or twice a month, which would interfere with his social interactions.  (R. at 411).  He also testified that he had anxiety problems, that his suicide attempts in 2003 were not his first attempts, and that he had continuing suicidal ideation.  (R. at 412-13).  He stated that he had problems with drugs until age 28, but that he has not had drug problems since that time.  (R. at 414).

At the time of the hearing, Plaintiff's right wrist was bandaged because, he testified, it was swollen.  (R. at 406).  He testified that he had had surgery on this wrist some years before the hearing and that he broke the wrist in approximately 1998.  (R. at 406).  He stated that his wrist pained him every day and that he could not use it in lifting.  (R. at 408, 417).  Plaintiff testified that he had problems with back pain, but that he denied a procedure which involved inserting a needle into his back.  (R. at 409-10).  He stated that his back pain radiated into his hip.  (R. at 410).  He also stated that his ankle was swollen and that he could not walk on it for long periods of time.  (R. at 416).  He stated that he could not sit for long periods.  (R. at 416).

Plaintiff testified that he could lift approximately ten pounds with his left hand, and that while he was on SSI prior to being incarcerated in 1999 he took care of his bills and finances.  (R. at 417).  He testified that he received up to a ninth grade education in Puerto Rico, and that he could read a little Spanish and almost no English.  (R. at 419-

20).  He testified that he had worked as a stock boy, but did not do any heavy lifting in that job because of his right wrist, and that he could not keep a job for more than a year at a time because his bad attitude always resulted in his getting fired.  (R. at 420).

<u>Medical Evidence</u>

*Mental Health Connections (Rome, New York)*

Upon release from prison in 2001, Plaintiff was treated for his mental health conditions at Mental Health Connections ("MHC") in Rome, New York from September 7, 2001 through June 5, 2002.  (R. at 120-32, 254-69).  At MHC, Plaintiff treated with psychiatrist Dr. Farago and social worker Elaine Romano.  (R. at 120-32, 254-69).  He was initially diagnosed with explosive disorder, dysthymic disorder, and personality disorder.  (R. at 120, 126-28).  Ms. Romano noted that Plaintiff was functionally illiterate and had memory problems, poor anger control and frustration tolerance, and a history of substance abuse.  (R. at 123).  His medications included Trazodone as a sleep aid and Wellbutrin for depression.  (R. at 120).

Throughout his treatment at MHC Plaintiff remained on several medications for mental health issues.  On December 19, 2001 Plaintiff reported no mood symptoms or psychosis, although he stated that sleeping remained problematic.  (R. at 259).  Plaintiff was prescribed Trazodone as a sleep aid and Remeron for anger and frustration.  (R. at 259).  On February 13, 2002, Dr. Farago prescribed Effexor to treat Plaintiff's Axis II irritability, but Plaintiff stopped taking this medication by March 13, 2002 because it caused dry mouth.  (R. at 259-60).  In June of 2002 Plaintiff was prescribed Celexa for his irritability.  (R. at 261).  Throughout 2002 he continued with Trazodone and Remeron.  (R. at 107, 202, 260-61).

4

*CNY Psychiatric Center*

Plaintiff was treated for depression and substance abuse problems at CNY Psychiatric Center from October 29, 2002 through January 26, 2003.  (R. at 229-53). During this time he continued to take Remeron and Trazodone for depression and anxiety.  (R. at 251).  After returning to prison in March of 2003, Plaintiff was readmitted to outpatient mental health services with CNY Psychiatric Center on July 9, 2003.  (R. at 303, 322).  While in prison, Plaintiff also received medical services for asthma, right hip pain, low back pain, and right wrist pain.  (R. at 307, 320, 325, 328-29, 337).

*Mental Health Connections (Utica, New York)*

Plaintiff continued treatment from February through March of 2003 at MHC in Utica, New York.  (R. at 199-207).  On February 24, 2003, Plaintiff was noted as hearing voices secondary to anger and stress.  (R. at 201).  Plaintiff's diagnoses of early onset dysthymia, intermittent explosive disorder, and personality disorder were continued.  (R. at 202).  During this time period, Plaintiff continued to take medications for his mental conditions, including Trazodone and Remeron.  (R. at 203).

*Faxton - St. Luke's Hospital*

Plaintiff went to Faxton-St. Luke's Hospital on March 25, 2003, complaining that Remeron was not helping for his anxiety so he had substituted more Trazodone.  (R. at 352-53).  Plaintiff was released and readmitted on March 27, 2003 for an overdose of Remeron and Trazodone.  (R. at 355).  Upon psychiatric consultation, Plaintiff was found to have "stable mental status and no significant depression."  (R. at 355).  He was released on March 28, 2003.  (R. at 355).

As a result of the March 27, 2003 incident, which Plaintiff described as a suicide

attempt, he was violated by his parole officer and incarcerated again for a period of one year beginning in March of 2003.  (R. at 403, 413).

*Dr. Bulawa*

Plaintiff treated with Dr. Bulawa from September 14, 2001 through May 10, 2002. (R. at 338-49).  On September 14, 2001, Plaintiff complained of low back pain with some radicular symptoms down his right leg.  (R. at 338).  Dr. Bulawa noted possible herniated disc disease, and recommended an MRI of the right hip.  (R. at 338).  Plaintiff continued to complain of low back pain on October 8, 2001 and February 18, 2002.  (R. at 339, 342).  On February 18, 2002, Dr. Bulawa assessed Plaintiff with reactive airway disease and prescribed Advair.  (R. at 342).

Plaintiff obtained MRIs of the lumbosacral spine and right hip on February 25, 2002.  (R. at 343-44).  The MRI of the lumbosacral spine showed a small central disc herniation at the L4-5 and L5-S1 levels which was not seen to significantly impinge on the exiting nerve roots or the thecal sac.  (R. at 343).  The hip MRI showed no significant signal abnormalities in the right hip, with no evidence of osteonecrosis, no fracture and no dislocation.  (R. at 344).  Dr. Bulawa described these MRIs as "basically unremarkable."  (R. at 346).

An EMG nerve conduction study was done on May 5, 2002 at the direction of Dr. Bulawa.  (R. at 346-48).  The results of this study were normal, a fact which Dr. Bulawa observed in his treatment notes of May 10, 2002.  (R. at 347-49).

*Insight House*

Plaintiff was treated at Insight House for substance abuse from approximately August 28, 2001 until May 28, 2002.  (R. at 154-60, 208-26).  When discharged from

6

the program on May 28, 2002, Plaintiff had maintained abstinence from drugs and alcohol and managed some improvement in his physical condition, which was not described.  (R. at 226).

*Dr. Dennis Noia*

A psychiatric and intelligence evaluation was completed by Dr. Dennis Noia on September 20, 2001.  (R. at 135-40).  Dr. Noia found that Plaintiff's affect and mood were neutral, and that he was oriented to time, place, and person.  (R. at 137).  Plaintiff's recent and remote memory skills were "moderately impaired due to his level of intellectual functioning."  (R. at 137).  His cognitive functioning was in the deficient range, his insight was fair, and his judgment was fair to poor.  (R. at 137).  He scored a verbal scale IQ of 60, a performance scale IQ of 52, and a full scale IQ of 52.  (R. at 138).  This result was consistent with mental retardation.  (R. at 139).  Dr. Noia diagnosed Plaintiff with depressive disorder, alcohol and cocaine abuse in full remission, moderate mental retardation, asthma, arthritis, and unspecified back pain and right hip problems.  (R. at 139).  Dr. Noia's prognosis was poor, given Plaintiff's low level of intellectual functioning, depression, and lack of work experience.  (R. at 140).  Dr. Noia also opined that Plaintiff was incapable of managing his own funds.  (R. at 140).

*Dr. Myra Shayevitz*

Dr. Myra Shayevitz performed an orthopedic consultative examination on September 20, 2001.  (R. at 141-47).  At that examination, Plaintiff's range of motion of the cervical spine and flexion was normal, extension was ten degrees, lateral flexion was normal and lateral rotation was normal.  (R. at 142).  There was cervical

tenderness and right paracervical tenderness.  (R. at 142).  Plaintiff demonstrated a limping gait with an inability to heel/toe walk, and was unable to rise from a supine position without Dr. Shayevitz's help.  (R. at 142).  Plaintiff reported that he went for walks, watched television, bathed and dressed himself, did some cooking and laundry, visited friends, cleaned the house and grocery shopped.  (R. at 142).

Dr. Shayevitz believed that Plaintiff "would have difficulty sitting for a prolonged period of time with definite limitations in standing, walking, stair-climbing or any significant lifting on the right."  (R. at 144).  She stated that Plaintiff's left hand was inoperable but that Plaintiff could lift with the left, and that Plaintiff could not handle small objects rapidly or repetitively on the right.  (R. at 144).

*Dr. Kalyani Ganesh*

Dr. Kalyani Ganesh performed a consultative examination on January 16, 2002. (R. at 161-69).  At that examination, Plaintiff reported that he was able to cook and clean, and do laundry and shopping with help from his cousin.  (R. at 162).  He also reported that he could manage his money and shower, bathe, and dress himself.  (R. at 162).  He spent his time at home watching television and surfing the internet.  (R. at 162).

In terms of his physical examination, Plaintiff had a normal gait and stance, full range of motion ("ROM") in the shoulders, elbows, and left wrist, with limited range of motion in the right wrist.  (R. at 162-63).  He also had a full ROM of the lumbar spine and negative straight leg raising ("SLR").  (R. at 163).  Plaintiff's hand and finger dexterity was intact.  (R. at 163).  Dr. Ganesh concluded that Plaintiff had "no physical limitation to sitting, standing, walking, climbing, bending, or the use of upper extremity,"

with "minimal limitation to lifting, carrying, pushing, and pulling because of back pain." (R. at 164).

*Residual Functional Capacity Assessments*

There are two Residual Functional Capacity ("RFC") assessments in the file, dated January 28, 2002 and January 30, 2002. (R. at 173-76, 191-98). Both of these were completed by non-treating, non-examining physicians. The January 28, 2002 assessment found that Plaintiff was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. (R. at 173-74). The physician concluded that Plaintiff "should be able to participate in low stress/low level work, and other than moderate [to] very limited difficulties in attention/concentration, no other limitations are greater than moderate." (R. at 175). Plaintiff had no other noted limitations.

The January 30, 2002 RFC assessment found that Plaintiff could occasionally lift twenty pounds, frequently lift less than ten pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour work day, and push and/or pull to an unlimited extent. (R. at 192). Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. at 193). He had no environmental limitations. (R. at 196). At the time of the assessment, Plaintiff stated that he could lift

8-12 pounds and stand, sit, and walk for about forty-five minutes at a time.  The physician did not believe these limitations to be credible based on Plaintiff's reported activities of daily living and lifestyle, which included living alone, cooking 3-4 times per week, and playing games on the computer all day.  (R. at 196).  The physician also gave no weight to Dr. Ganesh's opinions that Plaintiff would have minimal limitations in lifting and carrying and limitations in standing, walking, and sitting, because these opinions were non-specific.  (R. at 197).

*Psychiatric Review Technique Form*

A Psychiatric Review Technique form was completed on January 28, 2002.  (R. at 177-90).  This form noted that Plaintiff suffered from dysthymic disorder; intermittent explosive disorder; personality disorder with borderline, antisocial, and dependent features; moderate mental retardation; and alcohol abuse.  (R. at 180-83).  It found that Plaintiff had mild restrictions in activities of daily living, moderate limitation in maintaining social functioning and maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration.  (R. at 187).

## II.    STANDARD OF REVIEW

A court examining a denial of disability benefits must undertake a two-step review.  First, a court must determine whether the administrative law judge applied the correct legal standards.  Rosado v. Sullivan, 805 F. Supp. 147 (S.D.N.Y. 1992) (*citing* Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987).  Second, a court must decide whether the ALJ's findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).

The substantial evidence standard presents a low threshold.  Substantial evidence is evidence that a reasonable person would find adequate to support a conclusion.  Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  There need not be a preponderance of evidence.  Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).  A reviewing court may find substantial support although there is contradictory evidence permitting conflicting inferences.  Snell v.Apfel, 177 F.3d 128, 132 (2d Cir. 1999)(citing Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)).  Indeed, under this standard, the same body of evidence may adequately support contradictory findings.  Schauer, 675 F.2d at 57.  A reviewing court may not examine the evidence de novo or substitute its own interpretation for that of the ALJ.  Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

The opinion of a treating physician is entitled to controlling weight if the opinion is supported by objective medical findings and not contradicted by substantial evidence in the record.  20 C.F.R. § 1527(d)(2); Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).  However, the evaluations of non-examining State agency medical and psychological consultants may constitute substantial evidence.  See Schisler v.Sullivan, 3 F.3d 563, 568 (2d Cir. 1993)(holding that opinions of non-examining physicians are substantial evidence if they are in turn supported by evidence in the record).  An ALJ must treat such evaluations as expert opinion evidence of non-examining sources.  Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *1; 20 CFR 404.1527(f).  This treatment extends to consultants' RFC assessments.  SSR 96-

6p, at *4.  State agency consultants are experts in evaluating the medical issues of disability claims.  Id. at *2.  However, because such consultants do not have a treating relationship with the claimant, and because they might be unduly influenced by institutional demands, the ALJ gives their opinions weight only insofar as the record supports.  Id. at *3.

**III. DISCUSSION**

A.  Governing Law

Under the Social Security Act, an individual is disabled if he or she is unable to engage in "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. at 423(d)(1)(A).

To determine whether an individual is disabled under the Act, the Commissioner undertakes a five-step analysis.  First, the Commissioner decides whether the applicant is currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(I).  If not, the Commissioner considers whether the applicant has a "severe" impairment that significantly limits his or her ability to do "basic work activities."  Id. at § 404.1520(a)(4)(ii), 404.1520(c).  If the applicant alleges more than one impairment, the Commissioner must individually evaluate each impairment for severity.  See id. at § 404.1520(a)(4).  However, an ALJ's failure to make specific findings as to each impairment is harmless error if the record clearly reflects that the ALJ has considered each impairment before deciding that the applicant's condition is not severe.  See Smith

12

v. Sullivan, 726 F. Supp. 261 (D. Neb. 1989).

Third, if the Commissioner finds that an individual's impairment or combined impairments are severe, the Commissioner next determines whether these limitations meet or equal the impairments listed in Appendix 1 of the Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If an impairment meets or equals one of the listings, the Commissioner considers the applicant to be disabled.  Id.  If not, the Commissioner then considers the applicant's residual functional capacity ("RFC")[1] and whether he or she can still do past relevant work.  Id. at § 404.1520(a)(4)(iv).

In determining an individual's residual functional capacity, the Commissioner must consider objective medical evidence, including medical facts, diagnoses, and opinions.  Id. at § 404.1545(a)(3).  A decision must also account for the applicant's testimony, including an individual's description of his symptoms such as pain.  Id.; see also Charlebois v. Comm'r, No. 02 Civ. 686, 2003 WL 22161591, at *8 (N.D.N.Y. Sept. 12, 2003).  The Commissioner must offer substantial evidence of every physical demand listed in the regulations to demonstrate that an individual can perform the full range of work at a particular physical level.  See Charlebois, 2003 WL 22161591, at *8; LaPorta v. Bowen, 737 F. Supp. 180, 183 (N.D.N.Y. 1990).

The applicant bears the initial burden of proving that he or she is disabled within

---

[1]  The Act defines "residual functional capacity" as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations."  20 C.F.R. § 404.1545(a)(1).  The Commissioner particularly focuses on whether the individual meets physical exertional requirements of sedentary, light, medium, heavy, or very heavy work.  20 C.F.R. § 404.1567.

the meaning of the Social Security Act.  42 U.S.C. § 423(d)(5)(A); <u>Reyes v. Sec'y of Health and Human Servs.</u>, 807 F. Supp. 293, 298 (S.D.N.Y. 1992).  The applicant carries this burden by proving the first four steps of the analysis.  <u>Rivera v. Schweiker</u>, 717 F.2d 719, 722 (2d Cir. 1983).  Once an individual has proved that an impairment prevents him or her from returning to previous work, the burden shifts to the Commissioner to prove that there exists other work in the national economy to which the applicant can adjust despite his or her limitations.  20 CFR § 404.1520(a)(4)(v); <u>see</u> <u>Rivera</u>, 717 F.2d at 722–23; <u>Reyes</u>, 807 F. Supp. at 298.  Such work must exist in significant numbers in the national economy.  20 CFR § 404.1560(c).  To determine whether other work exists to which a individual can adjust, the Commissioner considers an individual's RFC together with the individual's age, education, or work experience. <u>Id.</u> at § 404.1560(b)(3).  If an individual is not capable of adjusting to other work, the individual is disabled.  <u>Id.</u> at § 404.1520(a)(4)(v).  If an individual is capable of adjusting to other work, such individual is not disabled.  <u>Id.</u>

To prove that other work is available, the Commissioner may, under appropriate circumstances, rely on the Medical-Vocational Guidelines included in Appendix 2 of Subpart P of section 404.  <u>Grey v. Chater</u>, 903 F. Supp. 293, 297–98 (N.D.N.Y. 1995). The Guidelines account for the applicant's residual functional capacity, age, education,

and work experience.[2]  Comparing these factors, the Guidelines indicate whether substantial gainful work exists to which the applicant can adjust.

The Guidelines are generally dispositive on the disability decision.  Grey, 903 F. Supp. at 298.  If the Guideline factors accurately describe an applicant's mental and physical condition, the Commission may rely exclusively upon these factors.  Id.  The Guidelines accurately describe an applicant's condition if substantial evidence supports the Commissioner's finding that the applicant can fully perform the exertional requirements of the work.  See id. at 299–302 (ordering remand because evidence did not support that the applicant could stand for two hours of a workday); see also Nelson v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989).  If not, the Commissioner must call a vocational expert to testify whether other work exists that the applicant can perform within his limitations.  See Nelson, 882 F.2d at 45.

B. Plaintiff's Arguments

_____Plaintiff argues that this Court should reverse the Commissioner's decision and remand to the Commissioner due to legal errors and insufficient evidence.  (Plaintiff's Br., Dkt. No. 18 at 10-12).  Plaintiff contends that (i) the ALJ erroneously failed to consider Plaintiff's non-exertional impairments when determining Plaintiff's RFC, (ii) the ALJ erred in determining that Plaintiff's mental impairments did not meet a listing of 20

---

[2] The Guidelines classify work by five different categories—sedentary, light, medium, heavy, and very heavy—based upon the physical exertional requirements of that work.  20 C.F.R. Part 404, Subpart P, App'x 2.  The Commissioner will place an individual into one of these categories based on his or her residual functional capacity. Id. § 200.00(a).  The Commissioner then considers the applicant's age, education, and previous work experience to determine whether her or she is disabled. Id.

C.F.R. Part 404, Subpart P, Appendix 1 (iii) the ALJ erred in applying the Medical-Vocational Guidelines rather than using a vocational expert, (iv) the ALJ improperly assessed Plaintiff's credibility.  (Plaintiff's Br. at 10-21).

<u>C.  Analysis</u>

*1.  Whether the Commissioner Erred in Not Considering Plaintiff's Non-exertional Impairments When Determining RFC.*

Plaintiff contends that the ALJ erred in failing to consider Plaintiff's alleged non-exertional impairments when determining Plaintiff's RFC.  (Plaintiff's Br. at 10-12). Plaintiff points to medical evidence indicating that Plaintiff has moderate to mild mental retardation, as well as psychiatric problems such as depression, explosive disorder, and personality disorder.  Despite his finding that Plaintiff's explosive disorder was "severe" within the meaning of the regulations, the ALJ stated that Plaintiff retained the RFC

> to lift or carry 20 pounds occasionally and 10 pounds frequently, stand or walk 6 hours in an 8-hour work day and sit 6 hours in an 8-hour work day **without any non-exertional limitations** . . . [Plaintiff's] capacity for light work is substantially intact and has **not been compromised by any non-exertional limitations**.

(R. at 20, 23, 25) (emphasis added).

In assessing RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. <u>See </u>42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 404.1545. The ALJ must also consider both the remaining exertional and non-exertional capacities and both capacities must be addressed in terms of work-related functions. See 20 C.F.R. Pt. 404 Subpt. P App. 2 § 200.00(e)(2).

Martinez v. Barnhart, 2007 U.S. Dist. LEXIS 44037 (D.N.Y. 2007).  In determining the severity of a mental impairment, the ALJ must assess a plaintiff's limitations in "four broad functional areas": (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  See Rosado v. Barnhart, 290 F. Supp. 2d 431, 437 (S.D.N.Y. 2003) (quoting 20 C.F.R § 416.920a(c)(4)).

There is evidence in the record which indicates that Plaintiff has problems with memory and concentration.  (R. at 123, 137, 173-74).  Throughout Plaintiff's psychiatric treatment, he had a continuing diagnosis of explosive disorder, personality disorder, and dysthymic disorder.  (R. at 120, 126-28, 177-90).  The psychiatric review technique form, completed by an agency physician, found that Plaintiff had mild restrictions in activities of daily living, moderate limitation in maintaining social functioning and maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration.  (R. at 187).  While the ALJ brought up some of these impairments in his decision, he failed to discuss them in terms of the four broad functional areas, and ultimately failed to consider Plaintiff's mental impairments – whether severe or non-severe – at all when determining Plaintiff's RFC.  In ignoring Plaintiff's established mental impairments, the ALJ impermissibly substituted his own judgment for competent medical opinion.  See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).

In light of the medical evidence presented, it was error for the ALJ to fail to consider Plaintiff's non-exertional impairments when determining Plaintiff's RFC.  This

case is therefore remanded for a proper evaluation of Plaintiff's non-exertional limitations, considering the medical record in its entirety and giving proper weight to medical source statements as to Plaintiff's mental impairments.

*2. Whether the ALJ Erred in Failing to Find that Plaintiff's Mental Impairments Met Listing 12.05B of 20 C.F.R. Part 404, Subpart P, Appendix 1.*

Plaintiff argues that the ALJ erred in determining that Plaintiff's mental impairments did not meet a listing of 20 C.F.R. Part 404, Subpart P, Appendix 1. (Plaintiff's Br. at 12-15).  In making this argument, Plaintiff cites the ALJ's discussion of Plaintiff's mental limitations, specifically the findings of mental retardation in the record. (R. at 20).  The record in this respect does not appear to be complete.  The ALJ cites to "Exhibit 6F" and "Exhibit 13F," both of which are said to comprise mental intelligence examinations of Plaintiff.  (R. at 20).  However, neither of these exhibits appear to be present in the record.  The only intelligence test in the record is that performed by consultative examiner Dr. Dennis Noia, in which Plaintiff scored a verbal scale IQ of 60, a performance scale IQ of 52, and a full scale IQ of 52.  (R. at 138).  If the results of this test are taken as representing Plaintiff's actual intelligence, Plaintiff would meet Listing 12.05, provided it could be established that his mental retardation had an onset before age 22.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.

Because the record appears incomplete with regard to Plaintiff's mental intelligence testing, the Court directs the ALJ, on remand, to collect and review the evidence necessary to properly assess whether Plaintiff's impairments satisfy the Listings as Plaintiff claims.

*3.  Whether the ALJ Erred in Relying on the Medical-Vocational Guidelines in Reaching His Determination Regarding Plaintiff's Residual Functional Capacity.*

Plaintiff argues that the ALJ erred in applying the Medical-Vocational Guidelines rather than using a vocational expert.  (Plaintiff's Br. at 15-19).  As discussed above, the ALJ determined Plaintiff's RFC without reference to Plaintiff's non-exertional limitations. The ALJ then determined that Plaintiff was not disabled, based on Medical-Vocational Rule 202.17.  (R. at 25).

Where significant non-exertional impairments are present, "application of the grids is inappropriate."  Rosa v. Callahan, 168 F.3d 72, 82 (2d Cir. 1999).  Instead, the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.  Id.  In this case, the ALJ's exclusive reliance on the grids was error, as there was evidence that Plaintiff suffered from significant non-exertional impairments which would require the testimony of a vocational expert or other similar evidence on the issue of whether Plaintiff could perform jobs that exist in the national economy.

In considering Plaintiff's impairments on remand, the ALJ may rely on the grids only as a framework to guide his decision. 20 C.F.R. § 416.969a(d). To determine whether jobs exist in the national economy that the claimant is capable of performing, the ALJ should consult other sources, such as a vocational expert. Rosa, 168 F.3d at 82; Jackson v. Astrue, No. 06-CV-6372, 2007 WL 1428442, at *5 (W.D.N.Y. April 25, 2007).

*4.  Whether the ALJ Erred in Assessing Plaintiff's Credibility.*

19

Plaintiff next argues that the ALJ inappropriately assessed his credibility. (Plaintiff's Br. at 19-21).  The ALJ has discretion to appraise the credibility of witnesses, including testimony of a plaintiff concerning subjective complaints of pain.  See Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984).  After considering a claimant's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject a claimant's subjective testimony.  20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2007); Martone, 70 F. Supp. 2d at 151.

If the ALJ rejects a claimant's subjective testimony, he or she must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence.  Martone, 70 F. Supp. 2d at 151 (citing Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987).  Where the ALJ's findings are supported by substantial evidence, the reviewing court must uphold the ALJ's decision to discount Plaintiff's subjective complaints of pain.  Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citing McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701 (2d Cir. 1980).

In his decision, the ALJ found Plaintiff's testimony not fully credible because it was belied by Plaintiff's reported daily activities, which included playing video and casino games, as well as the ALJ's own impression of Plaintiff's appearance at the hearing.  (R. at 22).  The ALJ reasoned that Plaintiff's sporadic employment history raised the question of whether Plaintiff's continuing unemployment was a result of medical impairments or incarceration.  (R. at 22).  The ALJ also concluded that the

objective medical evidence did not support Plaintiff's testimony that he has difficulty walking and cannot sit for very long.  (R. at 22).  The ALJ's conclusion in this regard is supported by substantial evidence, which indicates that MRIs and EMGs performed on Plaintiff yielded normal results.  (R. at 343-44, 346-48).

The ALJ's analysis of Plaintiff's credibility is thorough and the ALJ's reasons for discounting Plaintiff's credibility are apparent from a review of the decision.  Thus, the ALJ did not improperly assess Plaintiff's credibility.

## IV.  CONCLUSION

This Court REVERSES the final decision of the Commissioner of Social Security and REMANDS the case for further consideration of Plaintiff's non-exertional impairments.

IT IS SO ORDERED.

Dated: December 17, 2007

Howard G. Munson
Senior  U.S. District Judge